BOREN, OSHER & LUFTMAN, LLP
Jeremy J. Osher (SBN 192109)
josher@bollaw.com
222 N. Pacific Coast Highway, Suite 2222
El Segundo, CA 90245
Telephone: (310) 322-2021
Facsimile: (310) 322-2228

BROWN LAW APC
Lester O. Brown (SBN 160828)
lbrown@brownlawapc.com
1120 Forest Avenue, PMB 298
Pacific Grove, CA 93950
Telephone: (213) 716-0542

Attorneys for Plaintiffs
MATTHEW JACOBSON and ALISON GREINER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MATTHEW JACOBSON, individually and as Trustee of The Kahana Trust dated May 9, 2019; and ALISON GREINER, an individual,

Plaintiffs,

vs.

STATE FARM GENERAL INSURANCE COMPANY,

Defendant.

Case No.: 2:26-cv-04817

**COMPLAINT FOR:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
3. **UNFAIR BUSINESS PRACTICES IN VIOLATION OF BUS. & PROF. CODE SECTION 17200 ET SEQ.; AND**
4. **DECLARATORY RELIEF.**

**<u>DEMAND FOR JURY TRIAL</u>**

COME NOW Plaintiffs MATTHEW JACOBSON and ALISON GREINER hereby request a trial by jury and complain and allege as against Defendant STATE FARM GENERAL INSURANCE COMPANY as follows:

## NATURE OF ACTION

1. State Farm General Insurance Company ("State Farm") sold Matthew Jacobson and Alison Greiner (collectively, "Plaintiffs") an "all risk" homeowner's insurance policy, as more fully described herein (the "Policy"), to insure their home located in the Pacific Palisades neighborhood of Los Angeles, California. Plaintiffs bought that Policy with the understanding that it provided broad coverage for their dwelling, rent for an equivalent residence when their home was not habitable, and personal property. They reasonably believed that after paying State Farm hundreds of thousands of dollars in premiums since 2020, State Farm would step up and be the "good neighbor" it promises to be in times of crisis. As detailed herein, State Farm failed in this regard.

2. The Pacific Palisades wildfire began on January 7, 2025. It destroyed thousands of structures and displaced many residents and businesses. Those impacted, including Plaintiffs, now face years of restoring their properties and rebuilding the community. The fire burned continuously for weeks. It forced mass evacuations, prompting state and local emergency declarations. The havoc wrought by the Palisades Fire is well documented, as are the potential health impacts from exposure to the toxic contamination caused by the fire.

3. Although Plaintiffs' home itself was not burned down in the fire,[1] repeated testing by qualified experts has confirmed the presence of dangerous levels of hazardous substances in their home including polycyclic hydrocarbons, volatile organic compounds, dioxins hexavalent chromium, cyanide, arsenic, lithium, beryllium, lead, cobalt, manganese, cadmium, and numerous other carcinogens and contaminants.

---

[1] The fire did reach Plaintiffs' property and burned some of their exterior fencing, trees, and shrubs.

4. These carcinogens and contaminants were blown into Plaintiffs' home through numerous entry points, *e.g.*, openings, ventilation systems, and building envelopes, and were identified in wall cavities, ceiling cavities, attic spaces, closets, enclosed storage areas and structural materials, including framing and drywall. These internal locations are not subject to routine cleaning and are indicative of infiltration through the building envelope rather than surface deposition alone; indeed, the detection of cyanide and metals in structural materials further confirms chemical interaction with building components. To be clear, the chemical composition of certain building materials has changed as a result of the fire and resulting contamination.

5. This severe direct physical damage to Plaintiffs' home and personal property falls squarely within the coverage afforded by their "all risk" Policy, for which they paid more than $60,000.00 in premiums. More specifically, toxic contaminants that infiltrated and embedded in structural materials and personal property constitute "direct physical loss or damage" as that term is used in the Policy. Plaintiffs' experts have concluded that the residence and personal property have been fundamentally transformed and are no longer safe or usable for their intended purpose; that the contamination discovered cannot fully be remediated; that these contaminants pose a continuing risk of re-release into the indoor environment over time; and, that the home is not safe to occupy. Put simply, the home is a complete and constructive total loss.

6. Plaintiffs made a timely claim to State Farm. Instead of a fair and prompt resolution of their claim, Plaintiffs have been forced to endure severe delays, repeated reassignment of their claim to numerous adjusters, an inadequate claim investigation, and unreasonable coverage positions. Now, more than one year later, State Farm still refuses to pay Plaintiffs to repair, remediate, and restore their home in a manner consistent with the findings of their qualified experts, and to pay for direct physical loss to their personal property. State Farm has repeatedly delayed paying Plaintiffs' alternative living expenses, which are clearly covered under the Policy. Plaintiffs have been forced to pay significant expenses out of their own pocket (*e.g.*, rent, environmental testing, and other expenses

covered under the Policy) and to borrow money at high interest rates to cover these out of pocket expenses. These failures by State Farm have also forced Plaintiffs to incur legal fees to obtain the benefits to which they are entitled under the Policy.

7. Given the nature and extent of the toxic contamination and resulting health hazards, and despite the fact that the structure remains standing, the residence is a constructive total loss. Plaintiffs' experts, including its retained industrial hygienist, have determined that the home sustained pervasive, infiltration-level contamination consistent with a large-scale urban conflagration, including contamination embedded within structural materials and enclosed building components. As a result, the residence is unsafe and unusable for its intended purpose, and Plaintiffs cannot return to or occupy the home until full remediation—including removal and replacement of affected building materials, contents, and structural elements—is completed. The presence of hazardous contaminants embedded within the home constitutes "direct physical loss or damage" within the meaning of the Policy and applicable California law.

8. State Farm breached its duties under the Policy, California's Fair Claims Settlement Practices Regulations, and the law. To this day, State Farm has failed to perform reasonable and adequate testing at the insured location. State Farm has ignored questions raised by Plaintiffs regarding the potential health impacts associated with the January 2025 urban wildfire. State Farm took the unreasonable position that surface cleaning of contaminants is sufficient and otherwise acted contrary to its duty of good faith and fair dealing. State Farm unreasonably delayed its investigation of the more than $2 million in claims for personal property submitted by Plaintiffs pursuant to the Policy and has applied inconsistent and unreasonable positions with regard to Plaintiffs' claims for additional living expenses.

9. As noted by California Insurance Commissioner Ricardo Lara, "Wildfire survivors deserve fair treatment from their insurance companies. Insurance companies must investigate smoke claims properly—not deny them outright or pressure homeowners into accepting less than what they are owed. My message to insurance companies is clear:

consumer claims must be paid fairly, fully, and quickly."[2] Unfortunately, State Farm failed to heed Commissioner Lara's clear directives and instead placed its interests above Plaintiffs' interests and continues to withhold policy benefits from Plaintiffs in bad faith at a time when Plaintiffs are trying to recover from the destruction and havoc wreaked by the Palisades Fire. And Plaintiffs are not alone.

10. Indeed, on May 4, 2026, the Department of Insurance (DOI) announced a major enforcement action against State Farm after an expedited investigation uncovered significant mishandling of hundreds of insurance claims filed by survivors of the Palisades Fire (and Eaton Fire).[3] More specifically, the DOI issued an "Accusation, Order to Show Cause, Notice of Penalties, [and] Notice of Hearing" (the "Accusation"), which followed an extensive Market Conduct Examination of State Farm's claims handling practices. According to the Accusation, "the examination showed a troubling pattern of claims handling practices by [State Farm], including: slow and inadequate investigation of claims; underpayment of claims; numerous instances where multiple claims adjusters were assigned, over a short period, causing policyholder confusion; a lack of reasonable standards for prompt investigation and processing of claims, including in regards to smoke damage; and/or, delated or inadequate communications with policyholders." As set forth in this Complaint, Plaintiffs have been subjected to all of these unfair and unlawful claims handling practices by State Farm.

11. Commissioner Lara determined that he had "good cause to believe that [State Farm] has willfully committed unfair claims settlement practices" and that State Farm's conduct "constitutes grounds for the Commissioner to suspend [its] certificate of authority under Insurance Code section 704, subdivision (b)." Pursuant to the Accusation, the DOI

---

[2] 2025 Press Release, March 7, 2025, "Commissioner Lara orders insurers to fully investigate consumers' smoke damage claims following Southern California Fires," https://www.insurance.ca.gov/0400-news/0100-press-releases/2025/release023-2025.cfm.

[3] https://www.insurance.ca.gov/0400-news/0100-press-releases/2026/release019-2026.cfm.

is seeking an order that: (i) suspends State Farm's certificate of authority for a period not to exceed one year; (ii) directs State Farm to cease and desist from engaging in unfair or deceptive methods, acts, or practices in the insurance business as defined in Insurance Code section 790.03; and (iii) imposes penalties based on State Farm's wrongful acts.

## THE PARTIES

12. Plaintiffs MATTHEW JACOBSON (hereafter, "Jacobson") is, and at all times mentioned herein was, an individual residing in the County of Los Angeles, State of California. Jacobson brings this action individually and in his capacity as the Trustee of THE KAHANA TRUST DATED MAY 9, 2019 ("The Kahana Trust").

13. Plaintiff ALISON GREINER (hereafter, "Greiner") is, and at all times mentioned herein was, an individual residing in the County of Los Angeles, State of California.

14. Jacobson and Greiner are "Named Insureds" under Homeowners Policy No. 75-GZ-F427-7 issued by State Farm (the "Policy").[4] The Policy covers Jacobson and Greiner's primary residence located at 17753 Calle De Palermo, Pacific Palisades, California 90272. The Kahana Trust is an Additional Insured under the Policy. For ease of reference, Jacobson, Greiner, and The Kahana Trust are referred to collectively herein as "Plaintiffs."

15. Defendant STATE FARM GENERAL INSURANCE COMPANY ("State Farm") is, and at all times mentioned herein was, an Illinois Corporation, with its principal place of business in the McLean County, State of Illinois. Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, State Farm was licensed to transact, and did transact, business in California and in this judicial district under California License No. 1714-5 and/or NAIC No. 25151.

---

[4] For purposes of this Complaint, the term "Policy" shall refer to the "Renewal Declarations" for the period June 26, 2024 to June 26, 2025 and the State Farm Homeowners "Policy Booklet", both of which are attached hereto as **Exhibit "1"**.

16. According to its website, "State Farm is the largest homeowners insurer in the United States according 2020 premium data."[5] In its 2025 Annual Report to policyholders, State Farm claims that "[w]e maintain a relentless focus on the customer, supported by financial strength that allows us to keep our promises and our people—State Farm employees and independent contractor agents—are committed to building relationships based on trust and doing the right thing. … Customers are at the center of everything we do. That will never change."[6]

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction under 28 U.S.C. section 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.00.

18. The amount in controversy herein exceeds the jurisdictional minimum of this Court, and venue is appropriate under Code of Civil Procedure section 395, subdivision (a) and section 410.10, because State Farm is authorized to do business under the laws of California, and the acts and omissions giving rise to the claims in this Complaint occurred within the County of Los Angeles.

**GENERAL ALLEGATIONS**

***The State Farm Policy***

19. Plaintiffs are loyal State Farm policyholders. They have insured their property with State Farm since 2020. Plaintiffs always complied with their policy obligations. Since 2020 they have paid State Farm more than $200,000.00 in premiums, including the more than $60,600.00 in premiums they paid for the policy at issue in this coverage action. Prior to the Palisades Fire, Plaintiffs never tendered a claim to State Farm.

---

[5] State Farm Website, https://www.statefarm.com/insurance/homeowners#footnote-reference-1-1.

[6] 2025 Annual Report, https://www.statefarm.com/content/dam/sf-library/en-us/secure/legacy/pdf/2025-annual-report.pdf.

20. The Policy insured Plaintiffs' personal residence located at 17753 Calle De Palermo in the City of Pacific Palisades, California (the "Insured Property") for the period of June 26, 2024, through June 26, 2025.

21. "SECTION I—LOSSES INSURED" of the Policy makes clear that it covers the damages at issue here. It states that it covers losses caused by: "1. Fire or lightning" and "7. Smoke, meaning abrupt and accidental damage from smoke." Ex. "1" [Policy Booklet at 13].

22. Under "SECTION I—PROPERTY COVERAGES (COVERAGE A—DWELLING)" the Policy states:

> Dwelling. We cover the dwelling and materials and supplies located on or adjacent to the residence premises for use in the construction, alternation, or repair of the dwelling or other structure on the residence premises.

Ex. "1" [Policy Booklet at 5].

23. Under "SECTION I—LOSSES INSURED—COVERAGE A—DWELLING" the Policy states:

> We will pay for accidental direct physical loss to the property described in Coverage A, unless the loss is excluded or limited in SECTION I—LOSSES NOT INSURED or otherwise excluded or limited in this policy. However, loss does not include and we will not pay for, diminution in value.

Ex. "1" [Policy Booklet at 12].

24. The Policy further states:

> SECTION I—LOSS SETTLEMENT COVERAGE A—DWELLING 1. A1—Replacement Cost Loss Settlement—Similar Construction. We will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with similar construction and for the same use as on the premises shown in the Declarations, the damaged part of the property covered under SECTION I—PROPERTY COVERAGES, COVERAGE A—DWELLING. We will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction repair, or demolition of a building structure or other structure, except as provided under OPTIONAL POLICY PROVISIONS, Option OL—Building Ordinance or Law.

*Id.* [Policy Booklet at 19].

25. The Policy includes an Increased Dwelling Limit and Limitation on Building Ordinance or Law Coverage, for which the Plaintiffs paid an additional premium. That provision states as follows:

> **OPTIONAL POLICY PROVISIONS Option ID—Increased Dwelling Limit**. We will settle losses to damaged building structures covered under COVERAGE A—DWELLING according to the Loss Settlement Procedures shown in the Declarations. 1. If the reasonable and necessary cost to repair or replace the damaged dwelling exceeds the limit of liability shown in the Declarations for Coverage A—Dwelling, we will pay the additional amounts not to exceed the Option ID limit shown in the Declarations … .

*Id.* [Policy Booklet at 37]. This optional coverage is further explained in the Renewal Declarations:

> **EXTENDED REPLACEMENT COST COVERAGE** is intended to provide for the cost to repair or replace the damaged or destroyed dwelling without a deduction for physical depreciation. Many policies pay only the dwelling's actual cash value until the insured has actually begun or completed repairs or reconstruction on the dwelling. Extended Replacement Cost provides **OPTIONAL POLICY PROVISIONS Option OL—Building Ordinance or Law**. 1. Coverage Provided. The total limit of insurance provided by this option will not exceed an amount equal to the Option OL percentage shown in the Declarations of the Coverage A limit shown in the Declarations at the time of the loss, as adjusted by the Inflation Coverage provisions of this policy. This is an additional amount of insurance and applies to building structures on the residence premises.

*Id.* [Renewal Declarations, Notice to Consumers, Primary Forms of Residential Dwelling Coverage at 1].

26. The Policy includes—for an additional premium paid by the Plaintiffs—Building Code Upgrade Coverage, as follows:

> **OPTIONAL POLICY PROVISIONS Option OL—Building Ordinance or Law**. 1. Coverage Provided. The total limit of insurance provided by this option will not exceed an amount equal to the Option OL percentage shown in in the Declarations of the Coverage A limit shown in the Declarations at the time of the loss, as adjusted by the Inflation Coverage provisions of this

> policy. This is an additional amount of insurance and applies to building structures on the residence premises.

*Id.* [Policy Booklet at 38]. This optional coverage is further explained in the Declarations:

> **BUILDING CODE UPGRADE COVERAGE**, also called Ordinance and Law coverage, is an important option that cover additional costs to repair or replace a dwelling to comply with the building codes and zoning laws in effect at the time of loss or rebuilding. These costs may otherwise be excluded by your policy. Meeting current building code requirements can add significant costs to rebuilding your home. Refer to your policy or endorsement for the specific coverage provided and coverage limits that apply.

*Id.* [Renewal Declarations, Notice to Consumers, Primary Forms of Residential Dwelling Coverage at 1].

27. The Policy covers "Debris Removal" as an "Additional Coverage." It states:

> **SECTION 1—ADDITIONAL COVERAGES** 1. Debris Removal. We will pay the reasonable expenses you incur in the removal of debris of covered property damaged by a loss insured. This expense is included in the limit applying to the damaged property. The following coverages and limits also apply: a. When the amount payable for the property damage plus the debris removal exceeds the limit for damages property, an additional 5% of that limit is available for debris removal expense. This additional amount does not apply to **SECTION I—ADDITIONAL COVERAGES**, Trees, Shrubs, and Landscaping.

*Id.* [Policy Booklet at 9]. In the context of damage from wildfires and other fires, debris removal is a critical component of full remediation because toxic contaminants, ash, soot, and burned material residue must be removed before reconstruction or cleaning can occur and before a house can be safely reoccupied.

28. The Policy covers "Trees, Shrubs, and Landscaping" as an "Additional Coverage." It states:

> **SECTION I—ADDITIONAL COVERAGES**. 3. We will pay for accidental direct physical loss to outdoor: a. trees, shrubs, live or artificial plants, and lawns; b. artificial grass; and c. hardscape property used for aesthetic purposes not permanently affixed to realty; on the residence premises, caused by the following perils: Fire or lightning .… .

*Id.* [Polich Booklet at 9].

29. The Policy provides, as "**COVERAGE B—PERSONAL PROPERTY**":

> We will pay for accidental direct physical loss to the property described in Coverage B caused by the following perils, unless the loss is excluded or limited in **SECTION I—LOSSES NOT INSURED** or otherwise excluded or limited in this policy. However, loss does not include and we will not pay for, any diminution in value.

*Id.* [Policy Booklet at 12].

30. The Policy provides, as "**COVERAGE C—LOSS OF USE**":

> The most we will pay for the sum of all losses combined under Additional Living Expense, Fair Rental Value, and Prohibited Use is the limit of liability showing in the Declarations for Coverage C—Loss of Use. 1. Additional Living Expense. When a loss insured causes the residence premises to become uninhabitable, we will pay the reasonable and necessary increase in cost incurred by an insured to maintain their normal standard of living for up to 24 months.

*Id.* [Policy Booklet at 7].

31. The Policy contains the following relevant conditions:

> **SECTION I – CONDITIONS** 6. Suit Against Us. No action will be brought against us unless there has been full compliance with all of the policy provisions. Any action by any party must be started within one year after the date of loss or damage. If the loss is related to a state of emergency, as defined in subdivision (b) of Section 8558 of the Government Code, the time limit to bring suit is extended to 24 months after inception of the loss.
>
> **SECTION I – CONDITIONS** 8. Loss Payment. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and: a. reach agreement with you; b. there is an entry of a final judgment; or c. there is a filing of an appraisal award with us … .

*Id.* [Policy Booklet at 22-23].

32. Here, because Governor Newsom declared a state of emergency on January 7, 2025, the time limit to bring suit has been extended to 24 months.

/ / /

33. The applicable coverages and corresponding limits of liability in the Policy are as follows:

| **Coverage Type** | **Limits of Liability** |
|---|---|
| Coverage A—Dwelling | $7,637,300.00 |
| Coverage A—Dwelling Option ID—Extended Replacement Cost Coverage | $1,527,460.00 |
| Coverage A—Dwelling Option OL—Building Ordinance and Law | $763,730.00 |
| Trees, Shrubs, and Landscaping | $763,730.00 |
| Debris Removal | $381,865.00 |
| Coverage B—Personal Property | $5,727,975.00 |
| Coverage C—Loss of Use | $2,291,190.00 |

34. At all times relevant to this action, the Policy was in full force and effect, and Plaintiffs satisfied all conditions required of them. No policy exclusions apply to the facts alleged herein.

***<u>The Palisades Wildland Urban Interface Fire</u>***

35. On January 7, 2025, at approximately 10:00 a.m., the wildfire known as the Palisades Fire broke out southeast of Palisades Drive. Due to intense winds, the spread of the fire was instantaneous and deadly. By the evening of that first day, the fire spread to nearly 3,000 acres and more than 30,000 residents of the area were forced to evacuate. Plaintiffs' residence is in an area that was impacted by active fire according to the Map of the Palisades Fire provided by the LA Recovers website.

36. On January 7, 2025, the Chair of the Los Angeles County Board of Supervisors proclaimed a local emergency for the January 2025 Windstorm and Critical Fire Events, including the Palisades Fire. Mandatory evacuation orders and warnings were issued, and the State of California declared a state of emergency.

/ / /

37. On January 31, 2025, the California Department of Forestry and Fire Protection reported that the Palisades Fire finally was contained. Final assessments confirmed that there were twelve (12) confirmed civilian fatalities, three (3) confirmed civilian injuries, and one (1) confirmed firefighter injury.

38. On February 14, 2025, California Insurance Commissioner David Lara issued a notice to insurance companies that fire debris carries many harmful substances. The Commissioner warned that wind and weather changes can strengthen the exposure risk. The Commissioner emphasized, given the extent of the fire and winds, that there was no reason to assume that affected homes were habitable.[7]

39. The Palisades Fire became the third most destructive California wildfire on record. A report issued by the Los Angeles County Economic Development Corporation (the "LAEDC Report") noted the following devastating impacts from the Palisades Fire:

> CAL FIRE assessed 12,066 structures, with 56.3 percent (6,831) destroyed. An additional 8 percent (1,045) sustained major, minor, or affected damage, while 35.1percent (4,262) remained undamaged.
>
> - Residential: 55.8 percent (5,058) of single-family homes and 94.5 percent (361) of mobile homes were destroyed.
> - Commercial: 43.9 percent (101) of buildings were destroyed.
> - Community: 51 percent of schools and 46.2 percent of churches were lost or damaged.
> - Utilities & Infrastructure: 62.4 percent of utility structures were destroyed.[8]

---

[7] Ricardo Lara, *Additional Living Expense Coverage When Homes Are Uninhabitable*, Dept. Ins. (Feb. 14, 2025), http://publichealth.lacounty.gov/media/wildfire/docs/CDI_Notice_Re_Additional_Living_Expense_Coverage_When_Homes_are_Uninhabitable_as_a_Result_of_2025_Los_Angeles_Wildfires.pdf.

[8] *See* Los Angeles County Economic Development Corporation, Institute for Applied Economics, *Impact of 2025 Los Angeles Wildfires and Comparative Study*, Executive

40. The Palisades Fire is classified as a Wildland Urban Interface ("WUI") fire. It was more dangerous and harmful to human health than a typical wildfire. Public health and wildfire-toxicity experts have publicly noted that in WUI fires, when plastics, insulation, coatings, electronics, and treated building materials burn, they release complex mixtures of carcinogens, heavy metals, PAHs, and asbestos. The impact of WUI fires versus other wildfires on humans is disproportionately large, with experts concluding that emissions from WUI fires are three times more likely to cause premature death when compared to emissions from wildfires.[9] There is also significant danger in returning to the structures that remain standing. Scientists have found that the dangerous chemicals and substances emitted by WUI fires can remain inside homes for many years.[10]

41. Plaintiffs consistently expressed their concern to State Farm about the health impacts of WUIs resulting from the Palisades Fire. Those concerns are based on publicly available information that State Farm knows or should know about as a fire insurer in the State of California. Indeed, Plaintiffs referenced such studies in their correspondence with State Farm. Public health agencies, scientific researchers, regulatory agencies, and industry experts have warned that large WUI fires create complex, long-lasting contamination hazards when modern materials burn.[11] Studies have been conducted on the effects of these toxic chemicals in still-standing homes within the burn zones of previous WUI fires. Scientists found that a multitude of symptoms were reported including itchy and watery

Summary (Feb. 2025), https://laedc.org/wp-content/uploads/2025/02/LAEDC_2025-LA-Wildfires-Study_final2.pdf.

[9] Wenfu Tang et al., *Disproportionately large impacts of wildland-urban interface emissions on global air quality and human health*, Science Advances 11, 6 (2025).

[10] William D. Dresser, *Volatile Organic Compounds Inside Homes Impacted by Smoke from the Marshall Fire*, ACS Est Air (Special Issue) 2, 10.

[11] Corinne Purtill, *After the L.A. County Fires, Heart Attacks and Strange Blood Test Results Spiked*, L.A. Times (Dec. 17, 2025), https://www.latimes.com/environment/story/2025-12-17/la-fires-heart-attacks-strange-blood-test-results-spiked.27.

eyes, headaches, sore throat, allergic skin reactions, coughing, and breathing problems.[12] These symptoms were reported widely but were more concentrated in homes affected by smoke and/or ash.

42. Scientists studying the aftereffects of the Maui fire, a similar WUI fire, found similarly alarming results. Almost fifty (50) percent of the participants in the study reported that their health declined compared to the year before. The study found that when individuals were exposed to ash, smoke, and debris, there were more significant symptoms reported and more negative health outcomes. The study also found a heightened risk of cardiovascular disease, impaired kidney functions, and respiratory issues.[13]

43. The LA Fire HEALTH Study documented that VOCs are higher in homes in the burn zone and are higher inside of homes than outside. This same study found that the fires led to elevated PM2.5 levels in homes, with the impact extending two miles outside the burn zone.[14]

44. Several scientific papers released in the aftermath of the Palisades Fire highlight the dangers to human health associated with the types of contaminants that were spread as a result of the fire—including the contaminants found at Plaintiffs' residence. Notably, Plaintiffs' public adjuster and counsel provided State Farm with several of these papers. State Farm provided no substantive response.

45. In a paper titled "*Airborne Hexavalent Chromium Nanoparticles Detected Around Cleanup Zones for the 2025 Los Angeles Wildfires*," the research team lead by the University of California, Davis, concluded that there is a significant risk associated with

---

[12] William D. Dresser, *Volatile Organic Compounds Inside Homes Impacted by Smoke from the Marshall Fire*, ACS Est Air (Special Issue) 2, 10.

[13] Ruben Juarez et al., *Maui Wildfire Exposure Study: Community Health, Wellbeing, and Resilience*, University of Hawaii Economic Research Organization, 1 (2024).

[14] LA Fire Health Study, https://lafirehealth.org/.

exposure to the hexavalent chromium-containing nanoparticles resulting from the Palisades fire:[15]

> The 2025 Eaton and Palisades fires in Los Angeles exemplify destructive wildfires that increasingly threaten cities across the globe. … Outdoor nanoparticles can infiltrate indoors, and simple transport calculations indicate that hexavalent chromium-containing nanoparticles could travel several km downwind from the cleanup zone. Although the health effects from inhaled hexavalent chromium nanoparticles are uncertain, caution is warranted given that nanoparticles can easily cross cell membranes and circulate throughout the body. Residents near the cleanup zones should be aware of the potential risk so that they can take steps to reduce exposure and healthcare providers should monitor for possible health effects in these regions.

46. Another study concerning the health impacts of WUI fires stated the following with regard to the lasting risk of contaminants released during such fires:

> Materials from the built environment, such as plastics, insulations, treatment chemicals, and electronics, burn to produce toxicants that pose acute and long-term human health risks through inhalation, ingestion, and skin absorption. These pollutants have the potential to infiltrate the human respiratory and circulatory systems and contribute to significant health risks that can include heart attacks, strokes, hypertension, asthma exacerbation, and even death. Smoke and ash resulting from [WUI] fires also can provoke eye inflammation, dermal irritation, redness, and discomfort, with exposures potentially leading to more severe ocular conditions.[16]

47. On March 7, 2025, Commissioner Lara issued a formal Bulletin requiring insurance companies to fully investigate and pay legitimate smoke damage claims. In his Bulletin, Commissioner Lara stated the following regarding the handling of smoke damage claims for properties located in or near California Wildfire Areas:

---

[15] Michael Kleeman et al., *Airborne Hexavalent Chromium Nanoparticles Detected Around Cleanup Zones for the 2025 Los Angeles Wildfires*, https://www.researchsquare.com/article/rs-7401328/v1.

[16] Underwriters Laboratories Inc., *Guidance and Practical Strategies for Reducing Public Health Impacts of Wildland-Urban Interface (WUI) Fires on Community Populations*, UL 200C (Oct. 4, 2024), https://tinyurl.com/449mk7mn.

**Recent Cases Did Not Remove Coverage for Smoke Damage Claims**

The Department is aware of recent cases interpreting "direct physical loss of or damage to" property, or similar insuring language, in the context of claims for smoke damage. These recent cases do not support the position that smoke damage is never covered as a matter of law. Rather, the California Supreme Court's decision in *Another Planet* confirms that smokie damage can be covered where a policy insures against "direct physical loss or damage to" property, or substantially similar terms. …

**Guidance to Insurers for Proper Handling of Smoke Damage Claims**

The Department expects Insurers handling smoke damage claims to comply with California Insurance Code provisions that govern claims settlement practices, including without limitation California Insurance Code section 790.03(h), and all other applicable laws and regulations. …

According to the Los Angeles County Department of Public Health, fire debris and ash from wildfires may contain asbestos, heavy metals, chemicals, and other hazardous substances. Fire debris and ash also pose significant threats to public health through inhalation of dust particles and contamination of drinking water. The improper handling of fire debris and ash can expose residents to toxic materials and can spread hazardous substances throughout the community.

Evidence that smoke has caused such damage to a policyholder's property must be fully and fairly investigated. When a policyholder makes a claim for smoke damage, the insurer is required to act reasonably and promptly and to adopt and implement reasonable standards for the prompt investigation and processing of the claim. It is not reasonable to deny a smoke damage claim without conducting an appropriate investigation, nor is it reasonable for the insurer to require the insured to incur substantial costs to investigate their own claim. If professional testing is warranted for a specific claim, the Department expects the insurance company to contract and pay for these services.…

48. According to an October 2025 survey by Embold Research for the nonprofit Department of Angels, "State Farm customers have had far worse experiences than customers of other insurers, reporting much higher rates of claim denials, lowball claims estimates, poor communication, and multiple adjusters being assigned to their claims. The

survey noted the urgent need to resolve claims quickly as displacement coverage will be running out soon for many survivors who must either return home or find other housing."

49. In November 2025, Los Angeles County opened an investigation into State Farm's handling of insurance claims filed by policyholders affected by the January 2025 Eaton and Palisades Fires. "The investigation focuses on potential violations of California's Unfair Competition Laws and follows growing complaints from residents about delays, underpayments, and denials of legitimate wildfire claims. … Third-party surveys have found widespread frustration with State Farm's treatment of claims, with far too many residents facing undue claims delays, underpayments and denials that compound their hardship and loss in the aftermath of the devastating Eaton and Palisades Fires."[17]

50. In a letter dated November 13, 2025, to State Farm, County Counsel Dawyn Harrison notified State Farm of the investigation, identified several illegal and unfair practices that were the subject of the investigation, and demanded that State Farm produce several categories of documents regarding, among other things, the company's handling of claims arising out of the January 2025 wildfires, its claims handling policies, procedures, guidelines, and practices concerning wildfires, and its training materials, policy statements, guidelines or directives regarding claims arising out of the January 2025 wildfires.[18]

51. State Farm characterized the investigation as a "distraction."[19] In a December 18, 2025 message to policyholders impacted by the wildfires, State Farm claimed that its priority is "helping customers recover as quickly as possible," and that its claims professionals are ready "to guide them through the process with transparency and care."

---

[17] "*Los Angeles County Opens Investigation into State Farm's Handling of Wildfire Claims*," Office of the County Counsel, November 13, 2025, https://counsel.lacounty.gov/los-angeles-county-opens-investigation-into-state-farms-handling-of-wildfire-claims/.

[18] https://counsel.lacounty.gov/wp-content/uploads/2025/11/County-Counsel-State-Farm-2025-Wildfire-Claims-Letter.pdf.

[19] https://newsroom.statefarm.com/state-farm-general-insurance-company-update-on-california-2-2025/.

State Farm stated that it is committed to "clear communication, listening to customer needs, and addressing concerns promptly.[20]

52. As demonstrated herein, State Farm failed to live up to these promises with respect to Plaintiffs' claims (and likely others). Based on Plaintiffs' experience with State Farm, there is good cause for the County's investigation of State Farm's claims handling practices arising out of and related to the Palisades Fire.

***The Fire Caused Direct Physical Loss and Damage to Plaintiffs' Residence***

53. On or about January 22, 2025, Plaintiff Jacobson returned to his residence to assess the impact of the Palisades Fire. Jacobson reported to State Farm that he had observed "heavy smoke damage" throughout his home and fire damage to some of his exterior fencing, trees, and shrubs.

54. On January 29, 2025, Jacobson raised concerns about the airborne toxic contamination generated by the Palisades Fire. Jacobson suggested to State Farm that an industrial hygienist be engaged to assess the potential damage and risk. State Farm scheduled an inspection for February 27, 2025.

55. On February 27, 2025, State Farm performed what they called a "Wildfire Smoke Inspection" at Plaintiffs' home. State Farm's representative observed that "ash was present on all exterior surfaces" and observed fire damage to a fence and to "TSL" (*i.e.*, at least "1 large tree and 4 shrubs"). The representative further noted that "all rooms were affected" and that there was "ash and soot throughout all rooms on both floors of the home" and "in the attics."[21] The representative noted that the property was "uninhabitable, ash and soot everywhere no matter how much the PHs try to clean it up." Importantly, State Farm **did not perform any testing** for contaminants. State Farm failed to even test for heavy metals, soot, char, ash, and other toxic substances commonly found in WUI fires. Based

---

[20] *Id.*

[21] 11/24/25 State Farm Fire Claim History at 85.

on the visual observation and without conducting reasonable testing, State Farm issued a "repair estimate," which only provided for cleaning of surfaces throughout Plaintiffs' home.

56. Plaintiffs' Public Adjuster, 10 West PA, Inc. ("10 West"), engaged 3am Advisors ("3am") to inspect Plaintiffs' residence and to collect samples for subsequent laboratory analysis for a limited number of substances. 3am performed its inspection and sampling on February 27, 2025. The laboratory analysis was performed by EMSL Analytical ("ESML") (March 10-17, 2025) and Enthalpy Analytical ("Enthalpy") (March 12-20, 2025). The laboratory analysis performed by these two laboratories confirmed "extreme contamination levels" at Plaintiffs' home.

57. On April 10, 2025, 10 West provided State Farm with its report regarding the damage to Plaintiffs' home resulting from the Palisades Fire, together with the results of the testing performed by 3am and the laboratory analysis by EMSL and Enthalpy. The testing and analysis confirmed "extreme contamination levels" of lithium, lead, hexavalent chromium, and other combustion byproducts in Plaintiffs' home. 3am observed large deposits of particulates that had fallen from the attic down a plumbing chase to the floors below. 10 West made clear to State Farm that standard cleaning (as contemplated by State Farm) would not be sufficient to address the hazardous materials found inside and outside the dwelling. 3am emphasized that the dwelling was uninhabitable. State Farm did not dispute the 3am findings regarding the presence of heavy metals and other fire-related contaminants inside the home (*e.g.*, soot, char, and ash).

58. On July 24, 2025, State Farm provided 10 West with a report prepared by Keystone Experts & Engineers ("Keystone"). As noted in its report, Keystone concluded that "wildfire smoke has impacted the property throughout, including the exterior, interior, attic, and HVAC system." Importantly, **Keystone did not perform any metals sampling or sampling for other toxic substances commonly found in dwellings impacted by WUI fires**. Instead, Keystone's smoke impact recommendations were based on a limited observation of visible char, soot, and ash. Keystone limited its recommendation to the

cleaning of exterior and interior surfaces. It recommended evaluation of the HVAC system by a licensed professional. Keystone also failed to perform any invasive testing at the property.

59. On July 31, 2025, 10 West wrote to State Farm. 10 West specifically raised questions regarding the unacceptable dangers to Plaintiffs' health if they were to return to their home after the superficial cleaning proposed by Keystone. 10 West reminded State Farm about Commissioner Lara's February 14, 2025 Notice to insurers that "fire debris from burned structures can contain a variety of harmful substances, including: Asbestos from older building materials; Heavy metals like lead; Hazardous chemicals from household products; and Fine particulate matter created by the fire" (in other words, substances like those found in our clients' home). 10 West provided State Farm with copies of several publicly available studies regarding the potential residential health impacts resulting from the fires; included were new studies linking wildfire smoke exposure to increased cardiovascular and lung issues, cancer, neurological effects, and premature deaths. These and other publicly available studies make clear that contamination and smoke related health issues are likely to persist for exposed residents for years.

60. On September 3, 2025, 10 West notified State Farm of Plaintiffs' intent to engage Kaizen Safety Solutions ("Kaizen") to perform additional, invasive testing at their residence, including core sampling from drywall, insulation, framing members, and internal wall cavities. 10 West explained that the additional testing was reasonable and necessary due to the confirmed presence of several highly toxic contaminants at extreme and unacceptable levels, as well as the evolving state of the medical research concerning the human health impacts of exposure to hexavalent chromium, lead, lithium, beryllium, cobalt, VOCs, soot, char, and ash, *etc*. Given the extensive surface contamination previously confirmed by 3am and Keystone, and the elapsed time since the fire, Plaintiffs' research confirmed that it was scientifically necessary to comprehensively assess the potential migration of hazardous substances into structural elements. Indeed, this is now industry standard practice in modern WUI fire cases.

61. Kaizen performed its site visits on September 20-22nd, 2025. Kaizen performed a comprehensive investigation across multiple environmental media, including: air (VOCs and particulate matter); surface (soot, char, ash, metals, chloride); and bulk/structural materials (wood framing, drywall, contents). Based on Kaizen's experience extensive expertise, and the data generated from over 7,985 individual data points, consisting of visual observations, real time detection data, and laboratory analyses, Kaizen determined that Plaintiffs' home, its contents, and landscaping on the property sustained substantial fire damage (non-thermal and chemical contamination) from the Palisades Fire.

62. Kaizen reached the following non-exclusive list of conclusions regarding the conditions at Plaintiffs' residence, which are contained in a 554-page report (the "Kaizen Report"):

- Plaintiffs' residence was in the pathway of the Palisades Fire, fire emissions, smoke, gases, soot, char, ash, toxic metals, and particulates generated by the complete loss of the nearby conflagration of thousands of burned homes and their contents. The fire emissions entered Plaintiffs' residence at a high velocity per the documented hurricane force Santa Ana winds at the time of the fire.

- The fire damage to Plaintiff's residence is serious and extensive based on the presence of cyanide, arsenic, lithium, lead, chromium, beryllium, cobalt, manganese and cadmium, soot, char, and ash, phosphate and nitrate anions, and numerous other carcinogens and contaminants caused by the Palisades Fire. The fire damage is pervasive and impacts every "nook and cranny" of this residence. It is at an infiltration level of contamination.

- The presence of this combination of toxic metals post-fire is unprecedented. Any amount of beryllium found in the home is unacceptable. Beryllium is toxic at extremely low levels and because beryllium is so light, it can remain airborne for extended periods of time.

- Every porous material, including building materials and contents, that are capable of absorbing fire related chemicals are both presumed and proven to be contaminated from the Palisades Fire.

- All building materials used in the construction and contained within the residence as well as all contents that remain in this residence are presumed

to have similar concentrations of cyanide concentrations found in building materials and contents, the airborne gases identified in the living spaces, and a coating of smoke, lithium, chromium, beryllium, cadmium, arsenic, manganese, lead, soot, char, or ash.

- Current remediation remedies do not address nor reverse the damage caused by the complexity of the toxins that infiltrated, absorbed, adsorbed, penetrated or otherwise physically damaged and chemically changed the building materials and contents. Simply cleaning to remove visible fire debris does not address the chemical and physical changes of building materials and contents caused by the fire and it is ineffective in reversing fire damage of this complexity.

63. Following receipt of the Kaizen Report, Plaintiffs engaged Bresee Property Services ("BPS") headed by a highly qualified fire remediation expert with dozens of years of experience to inspect Plaintiffs' residence, review the Kaizen Report (and specifically the repair and remediation recommendations therein), and prepare a hypothetical cost estimate.

64. BPS concluded that full reconstruction of the dwelling is necessary. BPS concluded that given the Kaizen observations and testing results, selective remediation would introduce unacceptable cost uncertainly, rework cycles, cascading testing failure, and schedule risk.

65. BPS reached the following conclusions, which are set forth in a written report (the "Bresee Report"):

- Based on verified square footage, documented finishes, Kaizen findings, and prevailing post-wildfire construction conditions, a full demolition and reconstruction of the subject property at 17753 Calle de Palermo reasonably falls in the range of approximately $10.5 million to $12.5 million, inclusive of demolition, site improvements, professional fees, and contingency.

- The anticipated project duration of 24 to 36 months reflects the critical path realities of a large custom rebuild and directly supports the general conditions allocation carried in this estimate.

- Full reconstruction provides the only reliable, verifiable, and safe method to restore the property to pre-loss condition given the systemic contamination documented by the Kaizen and the scale of the structure and site improvements.

66. Both the Kaizen Report and the Bresee Report were provided to State Farm. At no time before or after receiving these reports did State Farm engage its own industrial hygienist or any other expert to perform sampling and laboratory testing at Plaintiffs' residence to determine the nature and extent of the contamination. Instead, State Farm directed Keystone to simply review and evaluate the Kaizen Report. Keystone, in turn, engaged Forensic Analytical Consulting Services, Inc. ("FACS") to review the Kaizen Report and to comment on whether the recommendations therein are "necessary and appropriate based on information available, as well as recommendations for additional sampling or other measures as appropriate."

67. FACS prepared a perfunctory written report dated March 18, 2026, in which it acknowledges that it "has not been to the property to provide [its] own wildfire smoke impact investigation," that its opinions are "based solely on review of the Kaizen report provided," and that "additional documents or information provided by FACS or FACS' own on-site investigation may result in differing opinions." FACS did not request any additional information or documents and did not request to inspect the site. Notably, FACS did acknowledge that "the single point readings [in the Kaizen Report] identified areas that could be considered elevated and may warrant corrective actions or further investigation." But FACS did not call for any additional testing in this regard, nor is it clear which single point readings FACS was referring to when it made this statement. FACS evaluation of the over seven thousand (7,000) date point in the extensive Kaizen point totaled less than two written pages.

68. In the face of the overwhelming evidence of severe and pervasive contamination throughout Plaintiffs' residence, and notwithstanding the fact that FACS failed to inspect the property or performed its own sampling or laboratory analysis, FACS took the unreasonable position that "there is insufficient evidence to warrant the level of

remediation recommended by Kaizen for the entire property," and that it "does not believe there is sufficient evidence to warrant disposal of all items, and removal of all wall material flooring."

69. Keystone curiously concluded there was no "need to perform an additional site inspection at this time" and that it "does not agree with the scope outlined in the Bresee Reconstruction Report." Keystone did not provide any justification for its disagreement with the results and recommendations in the Bresee Report. Nor did it even review that report.

***The Fire Caused Direct Physical Loss and Damage to Plaintiffs' Personal Property/Contents***

70. In addition to causing direct physical loss to Plaintiffs' residence, the Palisades Fire caused severe and extensive damage to Plaintiffs' personal property. Remediation of fire-related contamination, including gases and particulate, is impossible in soft goods and porous materials such as upholstered furniture, wooden furniture, mattresses, box frame mattresses, insulation, clothing, sound proofing, books, weather stripping, *etc*. Contents exposed to toxic metals, carcinogenic gases, and high levels of suspended particulate must be considered a total loss. Personal belongings such as art, books, rugs, and other items likely absorbed fire emissions, toxic metals, and fire debris associated with fire smoke damage should also be considered a total loss.

71. Numerous publicly available studies demonstrate that electronics exposed to smoke are subject to increased failure. All electronics, appliances, electrical systems, and mechanical systems in Plaintiffs' residence were exposed to fire contamination and should be considered a total loss based on the concentration of chloride, nitrate, phosphate and sulphate anion levels, soot, char and ash, and toxic materials found in Plaintiffs' residence.

72. On December 5, 2025, Plaintiffs' counsel provided State Farm with a report prepared by Low Voltage Architecture Inc. (the "LVAI Report") that detailed the cost to replace the electronics, appliances, theatre equipment, high-end electric shades, lighting,

HVAC, and lighting equipment, *etc.* throughout Plaintiffs' residence. The LVAI Report is comprised of four (4) separate proposals which together total $890,587.39.

73. On December 17, 2025, State Farm's adjuster wrote to Plaintiffs' counsel asking for clarification as to why "many of the electronic components, audio/visual equipment, appliances, and items that are not soft goods cannot be cleaned or repaired." The adjuster also reserved the right to have "the repairability of these items evaluated by an expert." Plaintiffs' counsel responded the following day and invited State Farm and its expert to the property to inspect the equipment that is the subject of the LVAI Report. It was not until March 10, 2026 that State Farm sent an engineer from Envista Forensics to Plaintiffs' residence to inspect the items in the LVAI Report.

74. As of the date of the filing of this Complaint, Plaintiffs have not received any coverage for the more than $890,000 in damaged electronics identified in the LVAI Report, nor has State Farm communicated its intent with respect to coverage for these items pursuant to Coverage B of the Policy. These items clearly fall within the coverage afforded by Coverage B—Personal Property.

75. On December 18, 2025, Plaintiffs' counsel provided State Farm with an inventory prepared by DYP Content Services, Inc. (the "DYP Inventory") of the personal property/contents (separate from the items in the LVAI Report) that Plaintiffs are seeking coverage for under Coverage B of the Policy. The DYP Inventory was provided to State Farm in the form of an excel spreadsheet that included live hyperlinks to relevant backup documentation. Plaintiffs' counsel also included a Google drive folder that included links to three subfolders: (i) a folder with 12,000 photos of personal property items sorted by room/area; (ii) a folder with vendor exhibits from an interior designer; and (iii) a folder with pricing references that are hyperlinked to the pdfs in the DYP Inventory.

76. State Farm adjuster Bangura acknowledged receipt of the DYP Inventory in writing on December 22, 2025, and claimed it was "currently reviewed." On January 12, 2026, nearly a month after counsel provided Bangura with the DYP Inventory, a new adjuster, Jimmy Reynolds stated that "we are currently reviewing the inventory and will

follow up with your office after we have completed our review of these items." Thereafter, on January 17, 2026, yet another adjuster, Isidro Molina, sent a letter requesting additional time to review the personal property claim and requesting "the inventory from DYP Content Services to be sent to a ClaimXperience link we will provide." The link was not provided until three weeks later. On February 6, 2026, Molina stated that the review of the items would not be completed until April 2026, after which it is entirely unclear when State Farm will decide which, if any, of the items on the DYP Inventory are covered under the Policy.

77. As of the date of the filing of this Complaint, State Farm has failed to provide an evaluation of the personal property inventory provided to State Farm in December 2025. As a result, State Farm has failed to provide Plaintiffs with any coverage for the more than $1.2 million in soft contents identified in the DYP Inventory. These items clearly fall within the coverage afforded by Coverage B—Personal Property.

78. On February 13, 2026, Plaintiffs' counsel provided State Farm with documentation regarding artwork that was damaged as a result of the Palisades Fire. More specifically, Plaintiffs' counsel provided an appraisal for one piece of art at $45,000.00 and an invoice for an additional $11,893.75 in art that had been purchased by Plaintiffs for their residence.

79. As of the date of the filing of this Complaint, State Farm has failed to provide a substantive response to Plaintiffs' claim for coverage for the $56,893.75 in damaged art that was submitted to State Farm on February 13, 2026.

***<u>The Fire Displaced Plaintiffs and State Farm Has Unlawfully Delayed Paying ALE Benefits Pursuant to Coverage C—Loss of Use</u>***

80. Plaintiffs' residence is 11,563 square feet and is located in one of the most exclusive areas in Los Angeles. The residence has seven (7) bedrooms and seven (7) bathrooms with two floors, a main level and a second level where the bedrooms are located. Due to the size of the residence, Plaintiffs purchased robust coverage for loss of use, with limits of liability of $2,291,190.00, so that in the event of a loss, they could temporarily

secure an equivalent residence that would permit them to "maintain their normal standard of living."

81. As a result of the Palisades Fire, and the severe and pervasive contamination throughout their residence, Plaintiffs were unable to return to their residence and instead were forced to secure temporary housing. Plaintiffs reasonably believed State Farm would honor its commitment to pay "the reasonable and necessary increase in cost incurred by an insured to maintain their normal standard of living for up to 24 months."[22]

82. On or about August 18, 2025, Plaintiff Jacobson entered into a short-term lease for the property located at 3130 W. Teal Road in Jackson, Wyoming (the "Teal Road Property"). The lease for the Teal Road Property commenced on September 8, 2025 and was to end on October 31, 2025 at a monthly rent of $78,495.00.

83. When Jacobson first identified the Teal Road Property, State Farm Team Manager Jeff Jasper advised that the Fair Rental Value ("FRV") was $17,430.00, based on information he received from a vendor called ALE Solutions. After Jacobson objected to the proposed FRV, State Farm conducted its own analysis, including reviewing relevant websites and contacting a local realtor. Based on this analysis, State Farm determined that "the estimated FRV for a furnished 7BR home is $100k+. The lease period for the [Teal Road Property] is 9/8 thru 10/31 (53 nights) for a total of $136,835, or $77,453.77." Jasper then approved the monthly FRV of $77,453.77 for the Teal Road Property.

84. Toward the end of August 2025, Jacobson contacted Jasper about a longer-term lease in Wyoming. Jasper advised Jacobson that it would not be a problem to secure

---

[22] Pursuant to California Insurance Code section 2060(b)(1), "[i]n the event of a covered loss relating to a state of emergency, as defined in Section 8558 of the Government Code, coverage for additional living expenses shall be for a period of not less than 24 months from the inception of the loss, but shall be subject to other policy provisions. **An insurer shall grant an extension of up to 12 additional months, for a total of 36 months**, if an insured acting in good faith and with reasonable diligence encounters a delay or delays in the reconstruction process that are the result of circumstances beyond the control of the insured. … **Additional extension of six months shall be provided to policyholders for good cause**." (emphasis added)

longer-term rental in Teton County at a price less than or equal to his then-current rental of $78,495.00. On or about September 17, 2025, Jacobson identified a property in Alta, Wyoming (*i.e.*, 200 Altamont Road, Alta, WY 83414 (the "Altamont Property"), which is larger than the Teal Road Property (in terms of square footage and acreage), has more bedrooms (4 versus 3), and substantial privacy. The monthly rent for the Altamont Property was $69,000.00, almost $9,500.00 less than the Teal Road Property.

85. On October 10, 2025, Jasper spoke to Plaintiffs' public adjuster and advised that State Farm had no objection to the Altamont Property or to the proposed rental amount of $69,000.00. However, a little more than a week later, and shortly before the lease on the Teal Road Property was set to expire, State Farm reversed course and advised Plaintiffs that it would not approve a one-year lease for the Altamont Property for $69,000.00/month. State Farm's refusal to approve the lease was not justified; instead, State Farm manufactured various excuses regarding ownership of the Altamont Property that did not justify its refusal.

86. Over the next few weeks, Jacobson and Smith pleaded with State Farm to approve the Altamont Property and repeatedly reminded State Farm that the lease on the Teal Road Property was set to expire on October 31, 2025. State Farm was aware that if it did not approve the lease for the Altamont Property or agree to pay for an extension for the lease on the Teal Road Property prior to its expiration, Plaintiffs would have no place to move. On October 30, 2025—the day before the lease on the Teal Road Property was set to expire—State Farm sent an unsigned email doubling down on its refusal to approve a lease for the Altamont Property.

87. Because State Farm refused to approve the Altamont Property and failed to pay for an extension of the lease for the Teal Road Property before it expired on October 31, 2025, Plaintiffs had no choice but to vacate the Teal Road Property. Plaintiff Jacobson thereafter signed a 12-month lease for the Altamont Property commencing December 1, 2025.

/ / /

88. On November 7, 2025—after Plaintiffs vacated the Teal Road Property—State Farm agreed to extend the Teal Road lease and belatedly issued a payment in the amount of $55,472.00. But State Farm still refused to approve the Altamont Property.

89. Because of State Farm's unjustified refusal to approve the Altamont Property, and notwithstanding the fact that Plaintiffs paid a substantial premium for almost $2.3 million in loss of use benefits, Jacobson was forced to pay $69,000.00 for December rent out of his own pocket.

90. On December 17, 2025, State Farm finally withdrew its objections to the Altamont Property. However, as it did previously, State Farm contacted ALE Solutions regarding FRV for the Altamont Property and communicated a lowball offer to Plaintiffs for ALE. Specifically, in its December 17, 2025, letter regarding the Altamont Property, State Farm indicated that "our research indicates the fair rental value for the property is $22,525.00."

91. Again, Plaintiffs repeatedly objected to State Farm's lowball offer in the letters dated December 22, 2025, January 27, 2026, February 5, 2026, February 25, 2026, and March 4, 2026. Plaintiffs reminded State Farm that Team Manager Jasper had previously lowballed the FRV for the Teal Road Property based on an opinion from the same ALE vendor but later approved a much higher rental rate. In response, State Farm advised that Jasper was no longer involved in the claim because the claim was reassigned to a different Claim Specialist, *i.e.*, Isidro Molina, who had a different Team Manager. Importantly, during a call with Plaintiffs' counsel on February 16, 2026, Molina confirmed that he had not spoken to Jasper, had not contacted any brokers in Alta, and had not reviewed any websites to determine the FRV for the Altamont Property.

92. It was not until March 12, 2026, that State Farm belatedly agreed to pay the monthly rent of $69,000.00 for the Altamont Property pursuant to Coverage C in the Policy.

93. In addition to State Farm's failure to reasonably and promptly handle their Coverage C claim, it also has repeatedly failed and refused to reimburse more than $75,500.00 in expenses that Plaintiffs were forced to incur as a result of the Palisades Fire.

More specifically, Jordan Smith of 10 West PA, Inc., sent Claim Specialist LaQuisha Bangura a detailed letter with several attachments describing the $75,591.73 in expenses incurred, including what they are, why they were incurred, justification for the expenses, and the legal basis for reimbursement. Mr. Smith's letter and attachments is more than sufficient justification for the requested reimbursement under Coverage C of our clients' policy. To date, none of these expenses have been reimbursed.

94. Plaintiffs' counsel has made repeated demands for reimbursement of these expenses, including on January 11, 2026, February 9-11, 2026, March 4, 2026, and most recently on April 13, 2026. Although State Farm has acknowledged receiving documentation regarding these expenses, as of the filing of this Complaint, none of these expenses have been reimbursed.

95. Plaintiffs have incurred significant costs covering State Farm's improper and unjustified delay in covering Plaintiffs' alternative living expenses.

***<u>State Farm's Repeated Reassignment of Plaintiffs' Claim to Multiple Adjusters Since January 2025</u>***

96. On January 28, 2025, Plaintiff Jacobson asked State Farm to guarantee that they would dedicate a single adjuster to their claim. State Farm's response was that it could not promise that the claim would not switch hands. Little did Plaintiffs know that from January 2025 to the filing of this Complaint, their claim would be shuttled from adjuster to adjuster, resulting in a lack of continuity of knowledge and investigation, as well as significant delays in adjusting their claim as each successive adjuster needed to start all over again getting up to speed on claim materials and correspondence. More specifically, and as demonstrated below, Plaintiffs' claim was repeatedly reassigned from January 8, 2025 through the present to a significant number of adjusters:

/ / /

/ / /

/ / /

/ / /

| Adjuster Name | Dates Handling Plaintiffs' Claim |
|---|---|
| Lance Cook, Clifford White, Knoxie Hall, Andrea Tillery, John Menard, and Jude Myers. | January 8, 2026 – January 30, 2025 |
| Logan Toups | January 30, 2025 - May 3, 2025 |
| Edwin Miranda | May 3, 2025 - May 17, 2025 |
| Tash Wright | May 17, 2025 – June 19, 2025 |
| LaQuisha Bangura | June 19, 2025 – January 7, 2026 |
| Stanley Robinson | January 7, 2026 – January 9, 2026 |
| Jimmy Reynolds | January 9, 2026 – January 29, 2026 |
| Isidro Molina, IV | January 29, 2026 - February 27, 2026 |
| Dana Booker | February 27, 2026 – Present |

97. Based on publicly available information, the repeated reassignment of claims between multiple adjusters is a pattern, practice, and policy of State Farm, which State Farm knew or should have known would result in claim delays and inconsistent claims handling and prevent meaningful progress towards the full payment of Plaintiffs' claims.

98. These delays and inconsistencies, which place State Farm's financial interests above those of Plaintiffs, have in fact resulted in inconsistent and contradictory positions with regard to Plaintiffs' claim, delays in processing without reasonable explanation, loss of continuity, conflicting reasons for denial and/or low offers, and an overall failure to promptly and reasonably investigate Plaintiffs' claim.

99. Moreover, State Farm is in violation of *Insurance Code* section 14047, which provides:

> (a) For a claim under a policy of residential property insurance arising as a result of a state of emergency, as defined in subdivision (b) of Section 8558 of the Government Code, if, within a six-month period, an insurer assigns

a third or subsequent first-party real or personal property claims adjuster to be primarily responsible for a claim, the insurer, in a timely manner, shall provide the insured with a written status report, establish a primary point of contact for the insured, and provide the insured with one or more direct means of communication with the primary point of contact.

(b) The primary point of contact shall be available to respond to inquiries by the insured related to the residential property insurance claim. Other claims personnel, vendors, or professionals, including clerical staff members and call center staff members, may work on portions of the insured's claim. Once assigned, the primary point of contact shall remain assigned to the insured's claim until the insurer determines that the residential property claim is closed or litigation has been filed.

(c) The insurer shall ensure that the primary point of contact refers and transfers an insured to the appropriate supervisor with a span of control over the primary point of contact upon the request of the insured. This process shall be satisfied by a referral to a first-tier or second-tier manager with authority over claim handling.

100. California Governor Gavin Newsom declared a state of emergency on January 7, 2025. As noted above, Plaintiffs' claim was reassigned at least three times within a six-month period on multiple occasions (*i.e.*, between January 7, 2026, to July 7, 2026 and between January 9, 2026, and February 27, 2026).

101. At no time since Governor Newsom's January 7th state of emergency declaration has State Farm established a primary point of contact for our clients. Nor has State Farm provided one or more direct means of communication with that individual. Because State Farm has not established a primary point of contact pursuant to Section 14047(a), it is in violation of Section 14047(b) and (c).

***State Farm's Bad Faith Breaches of the Policy***

102. Plaintiffs have at all times relevant to this Complaint complied with each and every one of their obligations under the Policy. They have timely paid substantial premiums for the coverage afforded under their Policy. They timely notified State Farm of their claim arising out of the Palisades Fire.

/ / /

103. Plaintiffs repeatedly expressed concerns regarding State Farm's: failure to address their concerns regarding the safety of returning to their residence; failure to conduct reasonable, prompt, and thorough investigations required by law; failure to perform adequate testing of the documented and pervasive contamination at their residence; disregard of Plaintiffs' interests; and failure to adequately explain its coverage positions and explain the bases for those positions.

104. State Farm breached the Policy by failing to perform reasonable, adequate testing of the severe and pervasive contamination in and around their home and by taking the position that said contamination can be remediated through superficial surface cleaning inside Plaintiffs' residence. Without performing adequate testing at Plaintiffs' home, State Farm lacks a factual and legal basis to support its position. It has no basis to oppose Plaintiffs' position concerning: (i) the nature and scope of the contamination; (ii) what remediation is necessary at the property; and (iii) whether the property can be remediated or must be deemed a total constructive loss, such that Plaintiffs are entitled to their limits under the Policy and more based on the conclusions of the Kaizen Report and Bresee Report.

105. Because of State Farm's failure to perform appropriate testing in Plaintiffs' home, Plaintiffs were forced to engage Kaizen at their own expense to perform the reasonable and necessary testing that should have been completed by their insurance company. That testing confirmed the presence inside their home of many hazardous substances above the safety levels established by government agencies. State Farm has not challenged Plaintiffs' position that it is not safe for them to return to their home now, or at any time prior to completion of the restoration and rebuilding of their residence. Indeed, State Farm continues to pay additional living expenses incurred by Plaintiffs, an acknowledgment that it is not safe for Plaintiffs to return to their home.

106. State Farm's breaches have caused, and continue to cause, significant harm to the Plaintiffs. Even if initial cleaning were to achieve surface-level clearance, environmental science and extensive studies show that fire toxins, including soot, VOCs,

heavy metals, and carcinogenic particles, are highly likely to re-enter and re-settle within the home due to ongoing environmental exposure. Plaintiffs' property is surrounded by destroyed structures and contaminated soil in the heart of the burn zone, ensuring that wind, rain, and construction disturbances will continue to reintroduce toxins for months or years. State Farm has ignored the risk of community recontamination, which makes any purported partial remediation plan unreliable and insufficient to return the home to a habitable condition. Despite multiple requests, State Farm failed to address or disprove the scientific evidence of persistent recontamination risk.

107. State Farm's refusal to acknowledge the risk of the continuing presence and reintroduction of hazardous substances demonstrates a willful disregard of scientific consensus. The Centers for Disease Control and Prevention, the Environmental Protection Agency, and California regulatory authorities have documented that communities damaged by wildfires and WUI fires remain vulnerable to persistent exposure and the reintroduction of hazardous substances due to airborne particulates, unsettled ash, and neighborhood-wide hazardous materials that can migrate into homes even after surface-level cleaning. State Farm's omission of any recontamination analysis from its coverage decisions underscores its bad faith.

108. State Farm also breached the Policy by failing to timely investigate and adjust Plaintiffs' claims for personal property under Coverage B of the Policy. Plaintiffs provided State Farm with significant documentation concerning their damaged electronics and soft goods. With regard to the more than $1.2 million in damaged soft goods, State Farm was provided with a detailed spreadsheet, performed by DYP at Plaintiffs' own expense, together with thousands of photographs and backup documents concerning the items and pricing. State Farm was also provided with a comprehensive report detailing the more than $890,000.00 in damaged electronics and appliances throughout the property. Despite having this information and documentation since the end of 2025, and despite repeated demands from Plaintiffs for a response to their demands for coverage, State Farm has yet to communicate a position regarding Plaintiffs' personal property damages.

109. On information and belief, State Farm deliberately and systemically delays paying policy benefits to policyholders to rebuild, repair, or remediate their homes, and to replace personal property, while policyholders exhaust their ALE limits. State Farm appears to be employing this practice which drives policyholders to desperation so that insured families will accept significantly reduced settlements. State Farm takes advantage of its policyholders' distress caused by their displacement and fear of exhausting ALE coverage as well as their inability to pay out-of-pocket for their temporary living arrangements as they fight with State Farm for the benefits they are owed. State Farm is engaging in this practice with respect to Plaintiffs here.

110. State Farm also has acted in bad faith by failing to timely comply with its obligations under *Insurance Code* section 2071. Section 2071 permits an insured to request all "claims-related documents" from a carrier and requires the carrier to provide the documents "**within 15 calendar after receiving a request**." "Claims-related documents" are defined in Section 2071 as "all documents that relate to the evaluation of damages, including, but not limited to, repair and replacement estimates and bids, appraisals, scopes of loss, drawings, plans, reports, third-party findings on the amount of loss, covered damages, and cost of repairs, and all other valuation, measurement, and loss adjustment calculations of the amount of loss, covered damage, and cost of repairs."

111. Plaintiffs' public adjuster (10 West) first requested copies of all "claims-related documents" in writing on July 31, 2025. Thereafter, Plaintiffs' counsel repeatedly followed up on the request; instead of timely producing the relevant documents (*i.e.*, within 15 days of the receiving Plaintiffs' request), State Farm provided excuses and claimed to not understand what documents Plaintiffs were requesting. It was not until December 16, 2025, that State Farm finally provided a link to 8,460 pages of documents referenced above. Thus, instead of producing the documents within 15 days of receiving Plaintiffs' request, **State Farm did not comply until 138 days after the initial request**.

112. On December 23, 2025, Plaintiffs' counsel wrote to the then assigned State Farm adjuster requesting that she provide an updated File History that covered the period

of November 18, 2025, to the present. Counsel also requested that State Farm justify the redactions to the claims-related documents that were produced. Plaintiffs' counsel followed up on January 5, 2026, January 27, 2026, and February 12, 2026. It was not until February 18, 2026, that State Farm acknowledged Plaintiffs' counsel's letters dated December 23, 2025, January 5, 2026, and February 12, 2026.

113. On March 5, 2026, Plaintiffs finally received an updated File History, which covered the period November 18, 2025 to February 19, 2026. The requested documents involved were finally received on May 13, 2025. **Thus, it took another 72 days to obtain the updated File History** and then another week to obtain the actual claims-related documents. State Farm clearly violated its statutory obligations under Section 2071.

114. As a result of State Farm's bad faith conduct and breach of its contractual obligations under the Policy, Plaintiffs have sustained damages in an amount not less than $15,000,000.00, exclusive of attorneys' fees, costs, and prejudgment interest.

## FIRST CAUSE OF ACTION

### Breach of Written Contract

115. Plaintiffs reallege and incorporate herein by this reference the allegations set forth in Paragraphs 1 through 114, as though fully set forth herein.

116. The Policy constitutes a valid, binding, enforceable contract pursuant to which State Farm agreed to insure Plaintiffs' dwelling and personal property against direct physical loss or damage, including smoke, soot, ash, and chemical contamination resulting from the fire.

117. The Palisades Fire caused direct physical loss of or damage to Plaintiffs' dwelling and personal property in the form of burn damage, pervasive smoke, soot, ash, and chemical contamination, as detailed in publicly available information as well as reports prepared by Plaintiffs' experts that were provided to State Farm. The presence of toxic contaminants embedded in structural materials and personal property constitutes "direct physical loss and damage" because these materials and personal property are unsafe and unusable for their intended purpose.

118. State Farm breached its duties under the Policy by:

a. Failing and refusing to pay for the reasonable and necessary environmental contamination testing required to determine the full extent of fire, smoke, ash, and soot-related damage to the Plaintiffs' residence;

b. Failing and refusing to pay the full cost of reasonable, necessary, and recommended remediation, repair and/or replacement of building materials and contents required to restore the Plaintiffs' residence to a safe and habitable condition (*i.e.*, remediation, repair, and/or replacement that is consistent with the Kaizen Report and Bresee Report);

c. Failing and refusing to pay for or reimburse the loss or destruction of personal property contaminated by smoke, soot, ash, and the various toxic chemicals that were identified in Plaintiffs' residence by multiple hygienists;

d. Failing and refusing to promptly pay additional living expenses incurred by Plaintiffs as a result of the uninhabitability of the Residence, which resulted in Plaintiffs having to come out of pocket; and

e. Failing and refusing to promptly and reasonably pay the benefits owed under the Policy.

119. As a direct, legal, and proximate result of State Farm's breaches, Plaintiffs sustained, and continue to sustain, substantial damages, in an amount to be proven at trial, but at least $15,000,000.00, plus interest.

## <u>SECOND CAUSE OF ACTION</u>

### Breach of the Implied Covenant of Good Faith and Fair Dealing

120. Plaintiffs reallege and incorporate herein by this reference the allegations set forth in Paragraphs 1 through 119, as though fully set forth herein.

121. Implied in the Policy is a covenant that State Farm would act in good faith and deal fairly with Plaintiffs, that State Farm would not interfere with Plaintiffs' rights to

receive benefits due under the Policy, and that State Farm would give at least the same level of consideration to Plaintiffs as it gave its own interests.

122. State Farm has a duty under the Policy, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under the Policy and to comply with California Fair Claims Settlement Practices Regulations.

123. Instead of complying with its duties, State Farm acted in bad faith by, among other things:

a. Failing to investigate Plaintiffs' loss by failing to initiate timely environmental testing despite known wildfire contamination risks;

b. Failing to engage qualified experts to perform sampling and testing of contaminants that State Farm knew existed at Plaintiffs' residence, which resulted in Plaintiffs being required to pay out of pocket tens of thousands of dollars for reasonable and needed testing;

c. Unreasonably dismissing the findings of Plaintiffs' experts with regard to the severe contamination in Plaintiffs' home, the resulting damage to Plaintiffs' dwelling and personal property, and the steps needed (and the resulting cost) to properly remediate the property and return it to its pre-loss condition;

d. Rotating multiple adjusters on the Plaintiffs' claim, resulting in delay, inconsistency, and lack of continuity;

e. Failing to provide required policy information and claim documentation, including documents requested pursuant to California *Insurance Code* section 2071;

f. Unreasonably failing and refusing to honor its promises and represented in the Policy;

g. Failing to timely provide Plaintiffs with ALE benefits, which resulted in Plaintiffs having to come out of pocket for benefits to which they are entitled under the Policy;

h. Unreasonably refusing to pay the full amount due under the Policy;

i. Failing to give equal consideration to Plaintiffs' interests;

j. Failing to comply with Insurance Code Section 2071 by timely providing Plaintiffs with copies of all claims-related documents; and

k. Otherwise acting as alleged hereinabove.

124. In breach of the implied covenant of good faith and fair dealing, State Farm did the things and committed the acts alleged above for the purpose of consciously withholding from Plaintiffs the rights and benefits which they were, and are, entitled to under the Policy.

125. These actions were not isolated errors. They were part of a claims handling approach designed to delay payment, limit exposure, and avoid recognizing total loss conditions arising from wildfire contamination.

126. At all relevant times, State Farm knew or should have known that wildfire smoke can deposit hazardous substances in residential structures; such contamination can render a home unsafe even in the absence of burn damage; and property evaluation requires specialized environmental testing and analysis. Despite this knowledge, State Farm consciously chose not to conduct adequate investigation and instead relied on incomplete or biased assessments to deny or limit coverage.

127. As a direct and proximate result of State Farm's breach of the implied covenant of good faith and fair dealing, Plaintiffs sustained, and continue to sustain, damages in an amount to be proven at trial. Plaintiffs are also entitled to recover all attorneys' fees that they reasonably incurred, and continue to incur, in their efforts to obtain the benefits due under the Policy that State Farm wrongfully withheld, and is withholding, in bad faith. Plaintiffs are further entitled to interest thereon at the maximum legal rate. Plaintiffs continue to suffer damages because of State Farm's bad faith.

128. The conduct described herein was carried out with conscious disregard of Plaintiffs' rights. Defendant's claims handling practices were developed, implemented, and ratified by managing agents (including officers, directors, other corporate employees with substantial independent discretionary authority over significant aspects of State Farm's

business) responsible for establishing company-wide policies regarding wildfire claims, investigation protocols, and loss valuation. These managing agents authorized or knowingly permitted the failure to require environmental testing in wildfire smoke claims; the systematic delay of claim handling through reassignment of adjusters; and the denial or underpayment of claims involving contamination-based losses.

129. State Farm's conduct is contemptible and was done with a conscious disregard of Plaintiffs' rights, constituting oppression, fraud, and/or malice. State Farm has engaged in a series of acts designed to deny Plaintiffs the benefits due under the Policy. Specifically, State Farm, by acting as alleged above, subjected Plaintiffs to prolonged displacement, exposure to health risks, and significant financial hardship while withholding policy benefits owed.

130. State Farm ignored Plaintiffs' interests and concerns with the requisite intent to injure under California Civil Code section 3294. Plaintiffs are therefore entitled to recover punitive damages from State Farm in an amount sufficient to punish State Farm and to deter similar conduct in the future.

## THIRD CAUSE OF ACTION

### Unfair Business Practices in Violation of Business & Professions Code Section 17200

131. Plaintiffs reallege and incorporate herein by this reference the allegations set forth in Paragraphs 1 through 130, as though fully set forth herein.

132. The California Unfair Competition Law (the "UCL"), which is codified under California Business and Professions Code sections 17200 *et seq.*, prohibit acts of "unfair competition," including any unlawful, unfair, fraudulent, or deceptive business act or practice. Plaintiffs have standing to pursue a UCL claim because they have suffered substantial financial loss as a result of State Farm's unlawful, unfair, and fraudulent conduct.

133. Plaintiff is informed and believe and thereon allege that at all times herein mentioned Defendants engaged in unfair and unlawful, deceptive, and unfair business

practices, as proscribed by California Business and Professions Code sections 17200 *et seq.*, including without limitation:

a. Misrepresenting the scope of the Policy and speed of its claims-resolution and payment process;

b. Failing to have Plaintiffs' home adequately tested for hazardous materials and debris;

c. Inadequately testing and disregarding the information provided and complaints by Plaintiffs and their experts regarding the potential dangers of returning to their home without adequate testing and cleanup;

d. Unreasonably dismissing the findings of Plaintiffs' experts with regard to the severe contamination in Plaintiffs' home, the resulting damage to Plaintiffs' dwelling and personal property, and the steps needed to properly remediate the property and return it to its pre-loss condition;

e. Failing to conduct a prompt, reasonable and thorough investigation and repeatedly reassigning the claim to multiple adjusters, which resulted in severe delays in the handling of Plaintiffs' claim;

f. Failing to comply with its obligations pursuant to *Insurance Code* section 2071; and

g. Disregarding Plaintiffs' interests and well-being.

134. As a direct, legal, and proximate result of these unlawful acts and practices, Defendant has reaped, and continue to reap, the benefits of their ill-gotten gains.

135. State Farm's practices violate the Policy, California *Insurance Code*, and California's Fair Claims Settlement Practices Regulations. Further, the alleged utility of State Farm's conduct, if any, is far outweighed by the harm such conduct inflicted upon State Farm's customers, including Plaintiffs.

136. Monetary damages alone are not an adequate remedy, given that Plaintiff will also seek the injunctive relief described above. Moreover, a damages remedy is inadequate given that Plaintiffs' theory of liability under the UCL claim is different from the other

claims for monetary relief, in that the UCL claim is premised upon violations of the California Insurance Code. *See Lin v. JPMorgan Chase Bank, N.A.*, 2024 WL 5182199, at *9 (C.D. Cal. Aug. 15, 2024).

## FOURTH CAUSE OF ACTION

### Declaratory Relief

137. Plaintiffs reallege and incorporate herein by this reference the allegations set forth in Paragraphs 1 through 136, as though fully set forth herein.

138. This Court is empowered under California Code of Civil Procedure section 1060 to declare the rights and legal relations of parties regardless of whether further relief is or could be claimed. A party may seek to have insurance contracts construed to obtain a declaration of rights, status, and legal relations under the insurance contract.

139. An actual and justiciable controversy exists between Plaintiffs and State Farm concerning State Farm's contractual duties under the Policy in relation to Plaintiffs' damages caused by the Palisades Fire.

140. The controversy between Plaintiffs and State Farm is ripe and of sufficient immediacy to justify judicial review and the issuance of declaratory relief. Plaintiffs contend that State Farm has a duty under the Policy to cover their dwelling and personal property losses resulting from the Palisades Fire.

141. Plaintiffs contend that State Farm, in breach of that duty, unreasonably failed to and/or refused to honor their coverage obligations under the Policy. Plaintiffs seek a judicial declaration of their rights and State Farm's obligations under the Policy including, but not limited to, a declaration that:

a. Losses and damage to Plaintiffs' residence and personal property caused by fire, smoke, soot, ash, and fire-related toxic contamination are covered under the Policy;

b. State Farm must pay the reasonable and necessary cost of comprehensive environmental testing and remediation and repair, including replacement where indicated (*i.e.*, remediation, repair, and/or replacement that is consistent

with the Kaizen Report and the Bresee Report), up to the applicable limits under the Policy;

c. State Farm must pay ALE benefits for the reasonable period required to complete repairs and restore habitability, including any applicable statement-of-emergency extension, up to the Policy limits; and

d. State Farm must pay for the full remediation of Plaintiffs property including the full replacement cost of Plaintiffs' home, in a manner consistent with the recommendations and findings by Kaizen and BPS.

142. Plaintiffs therefore desire a judicial declaration to determine the parties' rights and responsibilities under the Policy because the claim remains unpaid and State Farm's responsibility to provide coverage under the Policy remains.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs MATTHEW JACOBSON, individually and as Trustee of THE KAHANA TRUST DATED MAY 9, 2019, and ALISON GREINER pray for judgment against Defendant STATE FARM GENERAL INSURANCE COMPANY as follows:

1. For all damages suffered by Plaintiffs for breach of contract (First Cause of Action), including unpaid benefits for direct physical loss and damage to Plaintiffs' dwelling and personal property and unpaid additional living expenses, all in an amount to be proven at trial, but not less than $15,000,000.00.

2. For all damages suffered by Plaintiffs for breach of the implied covenant of good faith and fair dealing (Second Cause of Action) including consequential damages, *Brandt* fees, and punitive damages according to proof;

3. For restitution and/or disgorgement for unfair business practices in violation of *Business & Professions Code* section 17200 *et seq*. (Third Cause of Action);

4. For declaratory relief (Fourth Cause of Action) establishing coverage and

State Farm's obligations as stated above;

5. For reasonable attorneys' fees as permitted by law;

6. Pre-judgment and post-judgment interest as permitted by law;

7. For costs of suit incurred herein; and

8. For such other and further relief as the Court may deem just and proper.

Dated: May 4, 2026

BOREN, OSHER & LUFTMAN, LLP

Jeremy J. Osher
Attorneys for Plaintiffs
MATTHEW JACOBSON and ALISON GREINER

Dated: May 4, 2026

BROWN LAW, APC

Lester Brown (May 4, 2026 17:02:53 PDT)

Lester O. Brown
Attorneys for Plaintiffs
MATTHEW JACOBSON and ALISON GREINER

**DEMAND FOR JURY TRIAL**

WHEREFORE, Plaintiffs MATTHEW JACOBSON and ALISON GREINER hereby demand a trial by jury on all issues so triable in this Complaint.

Dated: May 4, 2026

BOREN, OSHER & LUFTMAN, LLP

Jeremy J. Osher
Attorneys for Plaintiffs
MATTHEW JACOBSON and ALISON GREINER

Dated: May 4, 2026

BROWN LAW, APC

Lester Brown (May 4, 2026 17:02:53 PDT)

Lester O. Brown
Attorneys for Plaintiffs
MATTHEW JACOBSON and ALISON GREINER